Berger v. New Hanover Cnty. Bd. of Comm'rs, 2013 NCBC 45.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 1942

BRIAN BERGER,

        Plaintiff,

    v.

NEW HANOVER COUNTY BOARD
OF COMMISSIONERS,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

{1}    THIS MATTER is before the court for a review of the action by the New Hanover County Board of Commissioners in removing Commissioner Brian Berger from his elected office.

*Anglin Law Firm, PLLC by Christopher J. Anglin for Plaintiff.*

*Ward and Smith, P.A. by John M. Martin and Michael J. Parrish for Defendant.*

Gale, Judge.

## I.   PROCEDURAL HISTORY

{2}    Plaintiff Brian Berger ("Berger") was elected to serve a four-year term on the Defendant New Hanover County Board of Commissioners ("Board") to expire in December 2014.

{3}    On April 22, 2013, the Board adopted a Petition in Amotion to Remove Brian Berger from the New Hanover County Board of Commissioners ("Petition") together with its several attachments, as well as a Notice of Hearing and set of

Amotion Hearing Rules and Procedure ("Revised Hearing Rules"). These were served on Plaintiff on April 23, 2013 by the New Hanover County Sheriff.

{4} Berger filed his original Complaint and an Application for Temporary Restraining Order and Preliminary Injunction ("TRO application"), both dated May 15, 2013. Civil Summons was issued on May 16, 2013.

{5} On May 16, 2013, Chief Justice Sarah Parker issued an Order designating the matter as exceptional pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts and assigning the case to the undersigned.

{6} The court held a telephone hearing on Plaintiff's TRO application on Friday, May 17, 2013 and then entered an Order Denying Plaintiff's Motion for Temporary Restraining Order on Monday, May 20, 2013, following earlier advices the court provided counsel by e-mail on Saturday, May 18, 2013.

{7} The Board held the noticed hearing on May 20, 2013 at which it determined by a majority 3–2 vote to remove Plaintiff from office. The Board issued its written order on May 21, 2013 ("Order of Removal"). During the hearing on Plaintiff's motion for a TRO, the Board's counsel indicated that the Board Chairman would recommend that, in the event of removal, Plaintiff's salary and benefits would not be suspended at least for 30 days. The Order of Removal includes such a provision, with salary and benefits continuing to June 30, 2013.

{8} Plaintiff filed his Amended Complaint and his Motion for Stay Pending Lawsuit ("Motion for Stay"), on June 14, 2013, seeking to remain in office pending court review of the Board's action. The court held a telephone conference on June 17, 2013 and entered an Order on June 19, 2013, denying a stay, incorporating the Board's agreement that it would not fill any vacancy pending the court's review, setting the matter for hearing on July 16, 2013 on specifically identified legal issues, and providing a schedule for prehearing briefs.

{9} The court held the hearing on July 16, 2013. The Parties agreed that this court has authority to review the Board's decision by *certiorari*, and the court proceeded to hear oral argument on legal issues raised by the Amended Complaint.

The court further afforded the Parties the opportunity to file supplemental briefs to address other due process issues first raised in Plaintiff's July 14, 2013 Memorandum as well as their respective arguments on whether the record contains sufficient competent evidence to support the Board's finding. The court reserved its ruling on all issues pending final briefs which were due on August 29, 2013.

{10} On August 16, 2013, the Board filed a Motion for Protective Order necessitated by Plaintiff's effort to depose Commissioners Wolfe and Dawson to obtain additional testimony for the court's consideration. The court held a telephone hearing at which it indicated it would grant a protective order because the court's review is limited to the record before the Board, and confirmed this oral ruling by an Order entered on August 20, 2013.

{11} Final briefs were timely filed on August 29, 2013. Neither Party has requested further oral argument. The record has been submitted, the court has reviewed both written and video transcripts, and the issues have been fully briefed, argued, and submitted. The matter is ripe for final ruling.

## II. SUMMARY OF PROCEEDINGS BEFORE THE BOARD

{12} The court here summarizes the proceeding before the Board only to the extent necessary to inform the court's review of issues raised by the Amended Complaint as elaborated upon in the briefs. Other details may have been omitted and are available for review in the written and video transcripts.

{13} Berger was elected in November 2010 to serve a term on the Board to begin in December 2010 and expire in December 2014. The Board determined in or around April 2013 to initiate proceedings to determine whether Berger should be removed from the Board. The record is not entirely clear as to the extent to which the Board further considered seeking local legislation to authorize a recall election.

{14} The Board elected to use the common law procedure known as "amotion." On April 8, 2013, the Board directed the County Attorney to prepare the Petition to initiate the amotion proceedings.

{15} On April 22, 2013, the Board approved the Petition which included 28 exhibits and three affidavits attesting to the exhibits, as well as the Revised Hearing Rules and a Notice of Hearing. These materials were served on Plaintiff by the Sheriff on April 23, 2013.

{16} Omitting some specific details, the Petition alleges, in sum, that Plaintiff had violated the Board's Code of Ethics, had created a hostile work environment, had created concerns for safety and security, had failed to adequately discharge the duties of his office, in part because of his tardiness and failures to participate meaningfully in policy decisions, suffers from a deteriorated mental awareness, makes unsupported accusations, and has suffered a loss of confidence by the Board and citizens. The various exhibits related, among other things, to fourteen delineated acts of alleged criminal acts or domestic violence, and thirteen selected e-mails deemed to be in violation of the New Hanover County Information Technology policy and which the Board contends reflects harassment of county staff.

{17} The Revised Hearing Rules provide that Plaintiff would be allowed to have counsel, that the Petition and its attachments would be considered for admission into evidence, that Plaintiff would be allowed to present evidence and testimony, and to make closing statements. Plaintiff did retain counsel who represented him at the Amotion Hearing. Although the Revised Hearing Rules reserved the possibility of imposing time limits for evidence or argument, no such limits were actually imposed. Plaintiff filed a witness list before the hearing, including twenty-one potential witnesses, four of which were other Commissioners.

{18} At the hearing on May 20, 2013, prior to beginning any evidentiary presentations, Board Chairman White stated that each of the five Commissioners, were present, but that only Plaintiff would be allowed to testify, because the other Commissioners were to serve as "triers of fact." (Amotion Hr'g Tr. (hereinafter ("Tr.") 11:9–15.) Plaintiff's counsel then made no request and took no further action to demand the right to examine any of the four Commissioners as to their potential bias in the nature of having made their determination before the presentation of evidence. At no time during the hearing did Plaintiff ask that the Commissioners

be placed under oath or tender testimony that he believed they would provide had they been called as witnesses.

{19} Also prior to any evidentiary presentation, Commissioner Barfield stated his belief that the Board should have pursued legislation authorizing a recall election rather than using the amotion procedure, as his concept of democracy was that only voters should exercise power to remove an elected Board member. He further expressed his concern that, "the decision has already been made." (Tr. 15:5–16:18.) He did not further elaborate as to the specific factual basis for this concern.

{20} The Board then began the evidentiary presentations by accepting the Amotion Petition and each of the 28 exhibits and three affidavits over Plaintiff's objection that the North Carolina Rules of Evidence ("Rules of Evidence") should be applied. (Tr. 12:1–12, 17:2–18:2.) The Board further accepted two additional affidavits which had not been included with the Petition. Plaintiff made no specific objection to these affidavits other than their admissibility under the Rules of Evidence. (Tr. 9:2–10.) In indicating that the Board would not apply the Rules of Evidence, Board Chairman White advised that Plaintiff would be allowed to challenge the weight to be given any of the exhibits. (Tr. 9:2–10, 12:2–4.) He later advised Plaintiff that he would also be allowed freely to introduce materials without complying with the Rules of Evidence. (Tr. 40:21–41:12.)

{21} Board Chairman White stated the Board's conclusion that the Petition and supporting materials satisfied the Board's burden of proof and invited Plaintiff to present evidence. (Tr. 19:4–8.) After again challenging the Board's acceptance of the Petition and documents without a testifying witness, Plaintiff began his evidentiary presentation, which included two witnesses and a notebook of documents. Plaintiff himself further made a statement after the evidence was closed, but, as did other Commissioners made his statement during discussion of the formal motion while not under oath.

{22} Plaintiff first called Sheila Schult, Clerk to the Board. (Tr. 21:3–4.) In his initial examination, Plaintiff sought to challenge any conclusion that Plaintiff improperly incurred travel expenses, including for example a failure to timely

check-in on the first night of a multi-night hotel stay (Tr. 23:20–24:5), to rebut the assertion that the various allegations of criminal conduct should be considered because there was no evidence of an actual conviction (Tr. 25:5–10), and to challenge the accuracy of the number of reported times that Plaintiff had been tardy for Board meetings. (Tr. 26:4–40:20.) Plaintiff further established that the travel policy referred to in the Petition had been actually adopted after Plaintiff incurred the expense for the missed reservation. (Tr. 41:14–42:6.)

{23}   Plaintiff's counsel also examined Ms. Schult regarding the series of e-mails attached to the Petition. She responded affirmatively when asked if she thought the e-mails evidenced harassment. (Tr. 43:8–44:15.) Plaintiff secured her agreement that Plaintiff had not threatened her physically. (Tr. 43:22–48:20.) As to the Petition's allegation regarding Plaintiff's improper access to county offices, Ms. Schult acknowledged that there is no written policy that would prohibit a Commissioner from using his office 24 hours a day. (Tr. 48:21–49:11.)

{24}   Board counsel's examination concentrated on the limited errors in attendance records so that the records nevertheless demonstrate a large number of times Plaintiff was tardy even after adjusting for any errors that Plaintiff had noted. (Tr. 49:21–53:1.)

{25}   Plaintiff next called Carolyn Bordeaux. (Tr. 58:15–16.) He first solicited Ms. Bordeaux's view that Plaintiff had not been convicted of any crime and that DWI charges against him were pending. (Tr. 59:22–60:8.) He then began a course of examination to challenge "the impartiality of this … [B]oard." (Tr. 64:3–5.) In substance, Plaintiff contended that bias was demonstrated because of a conversation Board Chairman White had after learning that Plaintiff intended to seek an order enjoining the May 20, 2013 hearing without first providing the Board notice. After learning from court officials that this request was being made, Board Chairman White advised Senior Resident Superior Court Judge Cobb that the Board wished to participate if any hearing on a request for injunction were to be held. (Tr. 65:21–70:13.) Ms. Bordeaux had been directed by Plaintiff's counsel to file the original Complaint and application of a Temporary Restraining Order,

although she is not employed by Plaintiff's counsel. In doing so, Ms. Bordeaux met with Judge Cobb. (Tr. 60:18–68:4.) At the hearing, during the course of Ms. Bordeaux's testimony, Plaintiff's counsel admitted that he had requested an *ex parte* order and expressed his view that he was not obligated to attempt to provide notice to the Board before seeking a restraining order. (Tr. 64:6–66:7.) Plaintiff's counsel directly inquired of Board Chairman White whether he made statements to Judge Cobb, in response to which Board Chairman White indicated that he had advised Judge Cobb that the Amotion Hearing might be postponed if there were indications that Plaintiff was seeking assistance with regard to the Board's concerns as to his mental health status (Tr. 67:2–12.), but that he had not discussed the merits of the Petition. (Tr. 67:17–71:19.) Plaintiff did not request to place Board Chairman White under oath or to examine him further on his allegation of bias.

{26}  Judge Cobb, as well as the other Resident New Hanover County Superior Court judges have recused themselves from participation in the case. (Tr. 71:11–19.) They have had no further participation in the matter and the undersigned has had no communications with them about the matter.

{27}  In his continued examination of Ms. Bordeaux, Plaintiff solicited testimony that she had never felt threatened by Berger, that she was not aware of his having threatened anyone else, and that he suffers from autism. Plaintiff did not seek to qualify Ms. Bordeaux has having any training in regard to autism, nor did her testimony indicate any basis upon which she based her conclusion. Plaintiff's counsel further solicited her opinion that the effects of autism include an inability to communicate and that communications by one suffering from autism may be mistaken for threats. (Tr. 72:15–74:10.)

{28}  After Ms. Bordeaux's testimony was completed, Plaintiff's counsel indicated that Plaintiff would not testify and no further witnesses would be called. (Tr. 76:10–77:3.) Board Chairman White then indicated that Plaintiff would be allowed an opening and closing argument. (Tr. 77:8–23.)

{29} In his initial argument, Plaintiff's counsel argued that the evidence regarding Berger's criminal matters cannot serve the basis for a removal because there has been no conviction, the criminal charges do not include felonies, and none of the charges relate to an "infamous crime" that might reflect an inability to serve as a Commissioner. (Tr. 78:2–82:12.) He then argued that there was no competent evidence by licensed professionals of any mental limitations that Plaintiff may have, and the Petition relied only on generalized allegations of mental incapacity. (Tr. 83:4–21.) Plaintiff's counsel asserted the insufficiency of the various categories of other evidence to prove a failure to complete job duties, to abide by established policies, or to create a hostile environment. (Tr. 83:22–92:16.) He again noted his objection that the exhibits to the Petition had been accepted without an adequate opportunity to respond. (Tr. 93:9–16.) Upon inquiry from Board Chairman White, Plaintiff's counsel acknowledged that no limitation had been made on his ability to subpoena witnesses or to introduce evidence other than limitations imposed on his right to examine fellow Commissioners. (Tr. 94:9–23.)

{30} Board Chairman White offered to reopen the evidentiary record to allow Plaintiff to call additional witnesses. Plaintiff's counsel responded, "Well, unless I am given an opportunity to – to question any of the other Commissioners. That is where the – then I have no other witnesses that I would call at this time." (Tr. 94:20–23.) This was the strongest statement Plaintiff ever made in opposition to the limitation on other Commissioners testifying. However, Plaintiff again did not seek to call any Commissioner and made no offer of what testimony he would solicit if allowed to call them.

{31} Plaintiff's counsel sought to tie the Board's acceptance of the Petition without a supporting witness to bias. He stated, "I question how this whole proceeding can be fair when Mr. Berger -- when Mr. Ber - - when Mr. Berger even though he has – we have been allowed to present evidence, there was no opportunity to cross examine the documents and there was also no opportunity for us to question any of the Commissioners who a lot - - who a lot - - who have a lot of factual evidence about - - about this case and I guess at this point, any - - any

examination of any of the Commissioners will just occur ‑ ‑ will just possibly occur on appeal." (Tr. 102:2–12.) Plaintiff's counsel closed his initial argument by cautioning the other Commissioners that they should restrict their consideration to the evidence presented and not consider any personal experience beyond that evidence. (Tr. 109:5–22.)

{32} The Board's attorney was then allowed to present a closing argument. In significant part, her argument was limited to summarizing the evidence so as to demonstrate its adequacy to prove Plaintiff's unfitness for office and his lack of capacity to perform as a functioning Board member. She placed the greatest emphasis on evidence regarding a hostile work environment and other security and safety concerns addressed in the Petition. (Tr. 110:11–121:16.)

{33} Plaintiff's counsel was then allowed a final argument, during which there was some discussion of Board Chairman White's personal observation of Plaintiff handing a letter to Governor McCrory and statements that Plaintiff had made regarding this event on television and at a prior Board meeting. (Tr. 126:23–127:10.)

{34} After arguments, the record was closed. (Tr. 129:5–9.) Commissioner Wolfe made a formal motion to remove Plaintiff from the Board. Vice‑Chairman Dawson seconded the motion. The individual Commissioners then spoke as to their positions.

{35} Speaking first, Vice‑Chairman Dawson relayed that she had personal experiences with Plaintiff but that the Board nevertheless had come to the hearing "without any predetermined outcome hoping to learn new evidence." (Tr. 130:23–131:2.) She explained the basis of her concern for and personal commitment to provide for safety and security and the responsibility to assure a safe work environment. (Tr. 131:17–136:12.) She acknowledged Plaintiff's counsel's request that she set aside personal issues. (Tr. 136:20–22.) She then recounted a personal experience when Plaintiff falsely claimed that she would not work cooperatively with him. (Tr. 137:3–17.) She expressed her wish that Plaintiff would resign and seek help for his personal problems. (Tr. 138:19–23.)

{36}     Plaintiff then spoke.  He disclaimed any basis for anyone other than himself having any concern for safety.  He stated that he had been falsely accused and that the amotion process had been engineered with the intent to put a predetermined successor on the Board.  He suggested that he had been given only two or three days to prepare his defense.  During Plaintiff's statement, Board Chairman White asked for specific facts to support Plaintiff's allegations.  (Tr. 139:17–149:10.)

{37}     Commissioner Barfield spoke next.  He again stated his view that the amotion procedure is not a proper vehicle to remove an elected official, and indicated that this is his view even though he personally wished that Plaintiff was not on the Board.  (Tr. 149:15–153:21.)  He stated, ". . . I do not know what is in other people's hearts.  I can only tell you what is in mine.  I do not have the ability to predict what is in someone's heart but I can know from past conversations that in my opinion, there was a foregone conclusion before we got here of what was going to happen on this day.  Be that as it may, as I said before, I am not in agreement of this process but I am in agreement that Mr. Berger needs to step down off of this board and continue life in some other form, shape or fashion."  (Tr. 153:12–21.)  Again, Commissioner Barfield did not further provide specific details that would document that other Commissioners had made any final determination to remove Plaintiff before the hearing was held.

{38}     Commissioner Wolfe then spoke.  Among other comments, he explained that he did not believe that the evidence regarding tardiness and non-compliance with policies and procedures was alone adequate to justify removal.  (Tr. 154:9–17.)  He expressed his greater concern that Plaintiff's behavior represented a safety threat.  He related his personal experience in seeing "senior staff ladies cry in fear."  (Tr. 154:18–22.)  He further referenced that past efforts to remedy concerns by censuring Plaintiff had not succeeded.  (Tr. 155:20–156:7.)

{39}     Board Chairman White spoke last.  He indicated that he had approached the hearing with an open mind and hope that Berger would respond to the allegations with acknowledgment of problems and assurances that he was

securing treatment for them. But he concluded that there had been no effective rebuttal to the facts stated in the Petition and that the Board's concerns had not been abated. (Tr. 156:8–157:20.) There was a brief exchange between Board Chairman White and Plaintiff regarding the letter given to Governor McCrory. (Tr. 158:17–159:11.)

{40}    Before the vote, Plaintiff's counsel did not seek to examine any of the Commissioners as to personal observations shared in their statements.

{41}    Board Chairman White then called for a vote. (Tr. 160:19–21.) The Board voted 3–2 in favor of removal. Commissioners White, Dawson, and Wolfe voted in favor. Commissioners Barfield and Berger voted in opposition. (Tr. 160:19–161:10.) Board Chairman White then directed New Hanover County staff to prepare Findings of Fact and Conclusions of Law. (Tr. 161:8–11.)

{42}    Board Chairman White signed the Order of Removal on May 21, 2013. Findings 1 through 5 detail the procedural history. Findings 6 through 10 are findings adopting the factual allegations of the Petition with its supporting documentation. Findings 11 through 14 state that Plaintiff was given a full and fair hearing. Finding 15 records Commissioner Dawson's personal observations. Finding 16 records Commissioner Wolfe's personal observations. Finding 17 records Commissioner White's statements as to his assessment of the evidence supported the Petition and its supporting documentation. Findings 18 and 19 reflect the Board's view that it has an obligation to respond to the evidence presented. Findings 20 and 21 indicate the Board's view that it has the power to act. Based on these findings, the Order of Removal then concludes that "there is sufficient evidence for the Board to determine that just cause exist [sic] to remove Brian Berger . . ." and then declared that Plaintiff was immediately removed but that no action would be taken to fill the vacancy for thirty days, and that Plaintiff's salary and benefits would remain in effect until June 30, 2013.

{43}    Further specific allegations or evidence will be discussed as necessary in the following analysis.

## III. STANDARD OF REVIEW AND THE ESSENTIAL QUESTIONS PRESENTED

{44}   Plaintiff's Amended Complaint seeks judicial review of a quasi-judicial finding by a governing body from which there is no specific right of appeal provided by law.  That finding is reviewable in the nature of *certiorari*.  *Russ v. Board of Education*, 232 N.C. 128, 130, 59 S.E.2d 589, 591 (1950).  Upon *certiorari*, the court sits as an appellate court rather than an original trial court charged with the duty of making its own findings of fact.  *Weaverville Partners, LLC v. Town of Weaverville Zoning Bd. of Adjust.*, 188 N.C. App. 55, 57, 654 S.E.2d 784, 787 (2008).  As to matters of law, the court proceeds *de novo*, meaning that it is not required to give deference to the governing body's determination as to such issues.  *Id.* at 58, 654 S.Ed.2d at 787–88.  In contrast, as to matters of fact, the court's inquiry is limited to determining whether there was sufficient competent evidence to support the finding, and if there was, the finding is conclusive, even if there was competent evidence to support a contrary finding.  In determining whether there is such evidence, the court examines the entire record below, and the process is referred to as a whole record test.  *Id.* at 57–58, 654 S.E.2d at 787; *see also Batch v. Town of Chapel Hill*, 326 N.C. 1, 12, 387 S.E.2d 655, 662, *cert. denied,* 496 U.S. 931 (1990).

{45}   In this case, the court is called upon to review both issues of law and fact.  Therefore it employs different standards of review.  Plaintiff's factual and legal arguments have evolved during the course of the proceeding.  In summary, the following are the questions now properly before the court and the standard of review the court must exercise:

1.   Does the court have jurisdiction to review the Board's action.  This is an issue law, to be determined *de novo*.

2.   May the common law amotion procedure be employed to remove an elected official if accompanied by adequate procedural safeguards and supported by sufficient competent evidence?  This is an issue of law to be determined *de novo*.

3. Was Plaintiff entitled to due process and did he receive it? This is an issue of law to be determined *de novo*.

4. Was there sufficient competent evidence to support the Board's finding of just cause to remove Plaintiff from office? This presents a mixed question of law and fact. The court must first determine the standard by which the evidence is to be measured, and does so *de novo*. It then utilizes the whole record test to determine if there was sufficient competent evidence to satisfy this legal standard.

5. If the Board's order to remove Plaintiff from office was valid, is Plaintiff nevertheless entitled to maintain his office until his successor is appointed and qualified? This is an issue of law to be determined *de novo*.

## IV. ANALYSIS

### A. The Court Has *Certiorari* Jurisdiction to Review the Board's Determination

{46}     The Amended Complaint requests first that the court provide Plaintiff with a *de novo* trial before the court sitting without a jury. The court has no authority to grant this relief. Alternatively, the Amended Complaint requests that the court review the proceedings to determine "whether or not Plaintiff received a fair and impartial trial and if the actions he was alleged to have taken allow his removal from office." (Am. Compl. Prayer for Relief, ¶ E.) This is in the nature of review by *certiorari*. A Superior Court is authorized to review quasi-judicial determinations by governmental agencies by *certiorari* where no process of appeal is otherwise provided. *Russ*, 232 N.C. at 130, 59 S.E.2d at 591. The North Carolina Supreme Court has recognized that, "when the motion is allowable only for cause[,] the soundness of such cause is reviewable by the courts . . . ." *Burke v. Jenkins*, 148 N.C. 25, 27, 61 S.E. 608, 609 (1908). The court accepts the Amended Complaint as a proper petition for review of the Board's finding by *certiorari*, the Parties have now

furnished the court with the record from below upon which the review is to be based, the court has received briefs and heard oral argument, and the matter is properly before the court for determination.

## B.     Amotion Remains a Valid Procedure When Accompanied by Procedural Safeguards and Findings Based on Sufficient Competent Evidence

{47}     The Amended Complaint ¶ 29 alleges that, "[t]here is a question of law whether the Amotion hearings are indeed still the law of the land in North Carolina." This phrasing of the question recognizes that the amotion procedure was at least recognized in North Carolina in some circumstances at an earlier point in time. North Carolina Supreme Court opinions compel this recognition, even though the decisions were issued several years ago and the amotion procedure has been seldom used. Plaintiff contends, however, that the procedure could not be used here for two primary reasons. First, he contends that the procedure has become outdated. Second, he contends that the power of amotion has never been extended to a county government whose power is more constrained than a municipal corporation. The court is not persuaded by either of these assertions.

{48}     The amotion procedure is derived from a corporation's implied powers to achieve its purposes, and refers to the inherent power of a corporation to remove a corporate officer for sufficient cause. It originated in the English common law and was a power exercised by municipal corporations at least as early as 1758. *Ellison v. Aldermen of Raleigh*, 89 N.C. 125, 127 (1883), citing Lord Mansfield's holding in *Rex v. Richardson*, 1 Burr. 539. *Ellison* reviewed the removal of an elected town alderman. In the course of its opinion, the North Carolina Supreme Court stated that "there can be no serious doubt of the right of a corporate body to vacate the seat of a corporate officer for adequate causes arising subsequent to taking his seat …." *Id.*

{49}     Later in 1908, the North Carolina Supreme Court framed the issue as: "[t]he question presented is the right of the town commissioners to remove an official for cause and upon notice[,]" and then upheld the town's exercise of that

right. *Burke v. Jenkins*, 148 N.C. 25, 27, 61 S.E. 608, 609 (1908). There, the commissioners had removed an elected city treasurer for his failure to abide by the commissioners' directions regarding the use of town funds. Without citing *Ellison*, *Burke* upheld the city's removal of the treasurer, and in doing so, discussed with approval Lord Mansfield's holding in 1883 that the power to remove a corporate officer "… is one of the common-law incidents of all corporations." *Id*. The *Burke* court further held that the removal procedure cannot be implemented without notice and an opportunity to be heard. *Id*. at 28, 61 S.E. at 609. The court did not further elaborate on whether those requirements were because the officer was being deprived of a property or liberty interest.

{50} *Burke* was later cited in *Stephens v. Dowell*, 208 N.C. 555, 181 S.E. 629 (1935). In a somewhat different context, as late as 1950, the North Carolina Supreme Court utilized the term "amotion" to describe a procedure that it upheld. *Russ*, 232 N.C. 128, 59 S.E.2d 589. It is then clear that the North Carolina Supreme Court expressly recognized the amotion procedure to remove an elected official as a part of the English common law which was adopted and used in North Carolina, and that the North Carolina Supreme Court has not since indicated any intent to restrict the procedure.

{51} Its adoption from common law is significant. The North Carolina Legislature has expressed a policy that principles of the common law remain in full force absent extraordinary circumstances. N.C. Gen. Stat. § 4-1 (2012) provides:

> All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State.

{52} Even the North Carolina Supreme Court has only limited ability to modify the common law. *See Wells v. Guardian Life Ins. Co.*, 213 N.C. 178, 195 S.E. 394 (1938). Certainly, this trial court's authority is even more constrained, and

quite clearly, a trial court may not simply choose not to follow direct holdings of the North Carolina Supreme Court.

{53}    Plaintiff suggests that the court can find an implied legislative policy rejecting a modern use of the amotion procedure because it has in other instances adopted local legislation providing for a recall election.  The court does not believe that the potential of a recall election necessarily negates the common law amotion process.  It is clear the Legislature knows how expressly to impose limits on removing an elected official and to increase judicial involvement in the process as it did when providing procedures for removing elected sheriffs.  *See* N.C.G.S. § 128-16–20 (2011).

{54}    Further, to restrict the county's corporate power by implying a policy against amotion would require the court to ignore that the Legislature has directed that a county board's corporate powers should be construed broadly.  Section 153A-11 of the North Carolina General Statutes recognizes the county as a corporate body and N.C.G.S. § 153A-12 directs that the powers of the corporation shall be exercised by the Board.  N.C.G.S. § 153A-4 directs that:

> It is the policy of the General Assembly that the counties of this State should have adequate authority to exercise the powers, rights, duties, functions, privileges, and immunities conferred upon them by law.  To this end, the provisions of this Chapter and of local acts shall be broadly construed and grants of power shall be construed to include any powers that are reasonably expedient to the exercise of that power.

{55}    As to Plaintiff's argument that a county's power is not as great as that of a municipal corporation, the Legislature's grant of authority to counties in N.C.G.S. Chapter 153A uses virtually identical language to the grant of authority to municipal corporations in Chapter 160A.  As to Plaintiff's argument that the amotion procedure has become archaic, the court notes that the Legislature completely recodified former Chapters 153 and 160 when enacting Chapters 153A and 160A.  It could have but did not retrench from the scope of its broad grant of authority and direction that such authority be broadly construed.

{56}     In sum, the court finds no basis to conclude that the amotion procedure recognized at common law has become archaic or has been expressly or impliedly withdrawn by either North Carolina's appellate courts or the Legislature, and the court finds no basis for distinguishing between the authority that counties or municipal corporations have to utilize an amotion procedure. There is then no basis in law to set aside the Board's use of the amotion procedure so long as its use was accompanied by appropriate procedural safeguards and the Board's findings and conclusions were supported by sufficient competent evidence. Clearly, the court recognizes that use of the amotion procedure has been and should be limited to extraordinary circumstances, for setting aside a decision of the electorate is not a light manner. For that reason, the courts remain vigilant to assure that the amotion procedure is not misused for improper political or personal purposes. But a trial court does so, not by removing the power of amotion altogether, but by its critical review of procedural safeguards employed and an appropriate examination of the sufficiency of the evidence supporting the findings. The court now turns its address to that review, leaving to the Legislature or higher courts any decision to abandon the amotion procedure itself.

## C.     An Amotion Proceeding Must Include Notice and Hearing, Including Fact Finding By An Impartial Decision Maker Based on Evidence Presented

{57}     The Amended Complaint's First Claim for Relief is labeled as a due process claim. Although not particularly artfully or precisely stated, the claim is essentially that the process the Board followed was infirm because the Board was not an impartial fact finder. Referencing Commissioner Barfield's expressed concern that the outcome of the hearing had been decided in advance (Am. Compl. ¶ 20), Plaintiff asserts that there is "an inference of a non-impartial arbiter." (Am. Compl. ¶ 28.) His prayer for relief asks the court to determine whether the hearing was "fair and impartial." (Am. Compl. Prayer for Relief, ¶ E.) Plaintiff's subsequent briefing raises a host of other procedural attacks, seeking largely to

incorporate formal judicial procedures into the Board's quasi-judicial determination.[1]

{58}  Before turning to the specific challenge, the court first notes the Board's contention that Plaintiff is not entitled any due process because he has no property right or liberty interest in his elected office. (New Hanover County Board of Commissioners' Supplemental Br. (hereinafter "Board Supp. Br.") 6.) But the Board also acknowledges, as case law requires it must, that certain due process procedures must accompany any quasi-judicial proceeding. (Board Supp. Br. 10.) The North Carolina Supreme Court conditioned its recognition of the amotion procedure to remove an elected official on at least notice and hearing. *Burke*, 148 N.C. at 28, 61 S.E. at 609. In a later decision, the North Carolina Supreme Court held that a "statutory proceeding for the amotion of a school committeeman is judicial or *quasi*-judicial in character," and that requisite procedures must include notice of the proceeding and charges presented, an opportunity to be heard and produce evidence in defense, and a full and fair hearing in which findings were based on evidence adequate to support the cause asserted as grounds for removal. *Russ*, 232 N.C. at 129–30, 59 S.E.2d at 590–91. As discussed more fully below, the court believes that once the right of a hearing attaches, there are other procedures that must be followed to assure that this hearing is a fair one.

1.    **The Revised Hearing Rules were adequate to provide due process so long as the Board made its decision as an impartial fact-finder based on evidence presented.**

{59}  The court divides its analysis into two parts. First, the court addresses Plaintiff's attack on the hearing procedures the Board implemented. Second, the court addresses the challenge to the Board's impartiality.

{60}  The court begins with Plaintiff's claim that he was not given adequate time to prepare for the hearing. (Pl.'s Supplemental Br. (hereinafter "Pl.'s Supp.

---

[1] The court believes that the due process claim is limited to one of procedural due process. Neither the Amended Complaint nor implications drawn from its generalized allegations rise to the level necessary to invoke a claim for the deprivation of substantive due process. *See Toomer v. Garrett*, 155 N.C. App. 462, 574 S.E.2d 76 (2002), *rev. denied*, 357 N.C. 66 (2003).

Br.") 7–8.)  Plaintiff suggested he had only prepared for a few days, but it is clear he was served with the Amotion Petition and its supporting documentation almost one month before the hearing.  (Tr. 144:9–14, 159:14–15.)  Plaintiff had adequate notice to file a witness list before the hearing and to prepare a notebook of exhibits he introduced.  His argument that he was not given adequate time to prepare finds simply finds no support in the record.

{61}    Next, the court addresses Plaintiff's challenge stated in the original Complaint filed before the hearing that the Board threatened to shorten the time in which he might present his defense.  No such time limitations were imposed at the hearing.  (Tr. 77:20–22.)  Plaintiff was not foreclosed from presenting evidence because of time constraints.  (Tr. 77:20–22.)  There is then no due process argument to be made on that basis.

{62}    The court now addresses Plaintiff's claim that the Board was required to follow the North Carolina Rules of Evidence (Tr. 10:11–20, 20:10–20) and because it did not he had no opportunity to "cross-examine the documents."  (Tr. 20:15–20.)  A board conducting a quasi-judicial hearing is not required to implement and follow the North Carolina Rules of Evidence.  *See Cook v. Union Cnty. Zoning Bd. of Adjustment*, 185 N.C. App. 582, 594, 649 S.E.2d 458, 468 (2007); *In re Application of Raynor*, 94 N.C. App. 173, 177, 379 S.E.2d 884, 887 (1989).  Plaintiff likewise was able to place materials in the record for consideration with the same latitude employed by the Board.  (Tr. 12:1–4.)  As to the claim that Plaintiff was unable to "cross examine the documents," one, of course, does not cross-examine documents.  The argument is a variant on the attempt to impose the authenticating requirements of the Rules of Evidence which the Board was not required to follow.  Plaintiff was given fair opportunity to attack the proper weight to be given to any document.  (Tr. 12:2–4.)  That satisfied the requirements for the *quasi*-judicial hearing.

{63}    The court turns to Plaintiff's assertion that it was improper for the Board to consider lay opinions as to Plaintiff's mental condition or fitness for office.  (Pl.'s. Supp. Br. 26.)  Plaintiff acknowledges that North Carolina case law clearly

establishes that a witness may offer observations based on personal experience. (Pl.'s Supp. Br. 26.) Lay opinion as to a person's mental or physical health can be considered. *Dunn v. Custer*, 162 N.C. App. 259, 267, 591 S.E.2d 11, 16 (2004).[2] In fact, Plaintiff took advantage of this rule in presenting testimony from Ms. Bordeaux. To the extent that Plaintiff argues that the evidence simply was not adequate to support the Board's finding, this is not a due process challenge.

{64}     Finally, the court finds no merit in Plaintiff's assertion that the Board improperly shifted its burden of proof to Plaintiff. His argument fails to distinguish between the burden of proof and the burden of persuasion. There is no argument that the burden of proof was on the Board to demonstrate just cause for removal, and the court can review whether it had sufficient competent evidence to satisfy this burden. The due process inquiry is whether Plaintiff was given the opportunity to confront the Board's evidence and to present evidence in his own behalf. He clearly had this opportunity so long as the Board's finding was based on the evidence presented. The Board did not improperly shift its burden. Likewise, if it considered Plaintiff's voluntary choice not to testify in his own behalf, which is not clear, it would not have been improper. *See Jacobs v. Locklear*, 65 N.C. App. 147, 150, 308 S.E.2d 748, 750 (1983). The court need to not further consider Plaintiff's argument that the extent of that consideration cannot rise to the level of imposing certain presumptions, as there is no evidence that the Board utilized or relied upon any such presumption.

{65}     In sum, the court concludes that the procedures the Board utilized comported with due process so long as it proceeded the decision to remove was made by an impartial fact-finder based on evidence presented. The court then turns to this second part of its due process analysis.

---

[2] The Supreme Court of South Carolina considered lay opinion specifically in the context of one's opinion as to a person's rationality and found that lay opinion on the subject was proper. *See Crowley v. Spivey*, 258 S.C. 397, 413, 329 S.E.2d 774, 784 (1985).

### 2. Plaintiff Did Not Prove Bias, But the Order of Removal Is Infected By Including Findings of Fact Not Based on Evidence Presented

{66} Findings of fact numbers 15 and 16[3] in the Order of Removal are based on statements by Commissioners Dawson and Wolfe made after the evidentiary presentation as to their personal observations and their personal interaction with unnamed county staff. While it may not have been improper for these Commissioners to explain how their review of the evidence presented may have been informed by their personal experiences, due process considerations clearly came into play when those personal experiences were themselves adopted as findings of fact upon which the Board's ultimate conclusion rested. In examining whether the conclusion resulted from a full and fair hearing before an impartial fact finder, the court cannot simply disregard findings based on the experiences of the fact finders themselves and then determine whether other findings were sufficient. The single fact that the decision was not on its face limited to the evidence presented but extended to personal experiences of the fact finders requires that the court remand the matter for such further proceedings as the Board may choose to implement.

{67} The court again returns to the Board's assertion that Plaintiff has no property or liberty right in his elected office and was not therefore entitled to the due process rights Plaintiff asserts. (Board Supp. Br. 6–7.)[4] But, as noted above,

---

[3] The court separately closely considered finding of fact 17 which represents views Commissioner White's expressed at the hearing. But after that careful consideration, the court concludes that finding 17 is not an improper finding outside the evidence, but may be considered a commentary on evidence actually presented.

[4] The court agrees that the holding of an elected public office has not been recognized in North Carolina per se as a "property right." *See Smith v. State*, 289 N.C. 303, 222 S.E.2d 412 (1976); *Mial v. Ellington*, 134 N.C. 131, 46 S.E. 961 (1903). The Board cites several other federal and state cases which stand for this general proposition. There are instances when it would be clear that no such right is being compromised, such as, for example, where one is not allowed to stand for election or not allowed to take office after an election. Likewise, a different circumstance may be at play when a superior authority eliminates an office altogether. Due process may further be owed when removing a person from office is accompanied by a loss of salary or benefits which may more classically satisfy the definition of a "property right." The record is not entirely clear what rights may have flowed to Plaintiff, but the Order of Removal indicates that Plaintiff would lose benefits and salary as of the effective date of June 30, 2013.

the North Carolina Supreme Court clearly conditioned the use of the amotion procedure on notice and hearing. *Burke*, 148 N.C. at 28, 61 S.E. at 609. Implicitly, the hearing must be a fair one. Here, at the inception of the May 20, 2013 hearing, the Board expressly stated its intent to provide Commissioner Berger a "full and fair hearing" (Tr. 18:16–20), and found in paragraph 14 of its Order for Removal that it had done so. The North Carolina Supreme Court has stated that, "[a]n unbiased, impartial decision-maker is essential to due process." *Crump v. Board of Education*, 326 N.C. 603, 615, 392 S.E.2d 579, 585 (1990). The court concludes that the hearing required under *Burke* must be a hearing before an unbiased, impartial decision-maker which bases its determination on the evidence presented. It need not further analyze whether rights that Plaintiff has rise to the level of a property or liberty right.

{68} Plaintiff relies heavily on *Crump*. But, the court notes that Plaintiff very clearly has not developed a factual record to support an assertion of bias as had *Crump*. In *Crump*, the North Carolina Supreme Court makes clear that such a record is essential, and bias cannot rest solely on "inference," so that Plaintiff's reference to such an "inference" in the Amended Complaint cannot not support remanding the matter. *Crump*, 326 N.C. at 616–17, 392 S.E.2d at 586. *Crump* also makes clear the Commissioners are not necessarily disqualified or biased solely because they have prior knowledge of significant facts. *Id.* Quite to the contrary, they are entitled to a presumption that as fact finders they acted with honesty and integrity even in the face of such prior knowledge. *Id. Crump* also does not mandate that Plaintiff was necessarily entitled to call any Commissioner as a fact witness beyond a limited inquiry necessary to assess bias.

{69} If the Board had not relied on fact findings based on the personal experiences of the fact finders, the court would conclude on this record that Plaintiff had failed to demonstrate a basis on which the Board's finding would be set aside on due process grounds. The burden is on Plaintiff to demonstrate bias. Plaintiff seeks to satisfy his burden by reference to two matters. First, Plaintiff suggests bias was shown because the Board majority had already chosen Plaintiff's successor

thereby creating some personal interest. (Tr. 143:21–23.) There was no evidentiary basis to support the assertion, particularly where the Board Chairman expressly denied the contention. Even so, that fact would not support a conclusion of actual prejudice. Second, Plaintiff refers to Commissioner Barfield's concern that the result of the hearing in favor of removal was inevitable. (Tr. 15:7–8.) Even if one were to conclude that this expression, with no further supporting details, were adequate to support an "inference," an inference is not sufficient. It is true that fact-finder bias may be shown by proof of a "prejudgment of adjudicative facts." *Crump*, 326 N.C. at 615, 392 S.E.2d at 585. But proof of such bias requires much more than innuendo or inference. Rather, there is a "heavy burden" required to prove bias and the necessity to "overcome a presumption of honesty and integrity in those serving as adjudicators." *Braswell v. Haywood Reg'l Med. Ctr.*, 352 F. Supp. 2d 639, 646 (W.D.N.C. 2005) (quoting *Simpson v. Macon Cnty.*, 132 F. Supp. 2d 407, 411 (W.D.N.C. 2001). This record is significantly short of meeting such a heavy burden.

{70} And, again, the Commissioners were not disqualified solely because they had prior factual knowledge. Cases establish that a decision maker is not disqualified nor is the presumption of integrity overcome simply because she has prior knowledge related to the controversy. *Kea v. Dep't. of Health & Human Servs.*, 153 N.C. App. 595, 605, 570 S.E.2d 919, 926 (2002). In fact, in some instances it may be inevitable that a decision maker will have prehearing knowledge of underlying facts. *See Evers v. Pender Cnty. Bd. of Educ.*, 104 N.C. App. 1, 16, 407 S.E.2d 879, 887 (1991).

{71} In sum, Plaintiff has not proven bias. Neither does the court conclude that Plaintiff would be necessarily deprived of due process by being unable to call the Commissioners as witnesses so long as the Board's ultimate decision rested on only other sufficient evidence presented. The due process concern arose because on the one hand the Commissioners were protected from testifying because they were fact finders but on the other hand they interjected their personal observations and interactions into the fact findings upon which their action was based.

{72}    The court has carefully considered the argument in the Board's memorandum that the Order of Removal can stand because there is sufficient competent evidence to support it even if findings 15 and 16 are disregarded.  Even if the court accepts the sufficiency of other findings to support the ultimate conclusion, that conclusion would not cure the due process concern of a fact finder having interjected facts based only on personal experiences not presented in the form of evidence.  The court is guided by the holding in *Crump* which recognized that a Board's decision cannot be saved simply by disregarding the vote of a biased fact finder leaving an adequate majority of other fact finders.  *Crump*, 326 N.C. at 618–20, 392 S.E.2d at 587–88.  The same logic applies to preclude dismissing due process concerns simply by disregarding certain fact findings based on the observations or experiences of the fact finders.

{73}    Again, the court has not found that there was bias.  It rather has held that the ultimate conclusions were infected by the insertion of personal experiences of the fact finder that were not presented in the form of evidence and subject to the hearing procedures attendant to the presentation of other evidence.  The court concludes that the ultimate decision should be by an impartial fact finder and should be based only on the evidence presented at the hearing.

{74}    The court cautions that it also has not held that any removal from office would be foreclosed even if bias could be proven in any further proceeding. The court is aware of no authority by which the Board could delegate its decision making by appointing a special committee as might a private corporation.  As such, other than a recall election, it is the only body having authority to consider removal. There are cases where courts have upheld even biased *quasi*-judicial decisions when they were made by the only governmental body that had the power to make the finding.  They did so employing a doctrine referred to as the "rule of necessity." *See* Arnold Rochvarg, *Is the Rule of Necessity Really Necessary in State Administrative Law: The Central Panel Solution*, 19 J. NAALJ 35 (1999) (discussing the application of the rule of necessity in state administrative agencies).  The court expresses no

opinion on whether this rule of necessity would apply where there is the possibility of a resort to a legislatively authorized recall election.

### D. The Sufficiency and Competency of Evidence to Find Just Cause for Removal Must Relate to the Duties of the Elected Office

{75}    Having determined that it must remand the matter for the reasons stated, the court does not have before it the final record from which to determine an ultimate finding as to sufficiency of competent evidence to support removing Plaintiff from his elected office.  The court believes it nevertheless appropriate to provide observations from its studied review of the present record, the extensive briefing and the cases and other legal authorities which have been cited.  A court reviewing a finding removing an elected official from office after having been given full due process will utilize the deferential whole record test to judge the sufficiency of evidence, but before doing so, will be cognizant of the legal standard against which that evidence is to be measured.  That standard is not well-defined, in significant part because the amotion procedure has been so seldom used, particularly in North Carolina.  But, it seems clear that a court called upon to make that final review will necessarily be faced with achieving the balance between the extraordinary concept of overturning the results of an election and a set of facts which can also be extraordinary in its presentation of how an elected official has acted or failed to act so as to hamper the functioning of the office to which he or she was elected or create safety, security, or liability concerns arising from his or her action or inaction in office.

{76}    Here, the Board utilized a standard of "just cause" or "reasonable just cause."  That standard is consistent with the language of the North Carolina Supreme Court decisions.  In *Burke*, the court quoted with approval from a treatise that referred to removal from office "for reasonable and just cause."  *Burke*, 148 N.C. at 25, 61 S.E. at 609 (quoting 1 John. F. Dillon, *The Law of Municipal Corporations* § 240 (4th ed.)).

{77}    But the North Carolina case law provides no further concrete guidance on what may be required to find "just cause." After substantial study, the court agrees with the Board's position that ultimately the evidence must be measured on a case by case basis on something less than a single comprehensively defined objective standard. That said, the notion of "cause" should not flex solely on the whims of political winds. But, the standard must be flexible enough that the governmental body has a reservoir of power to respond to that extreme set of facts that challenges the integrity of the governmental process. Ultimately, a court may be unable to draw precise dividing lines that define when amotion may or may not be appropriate. The court concludes, however, that in all cases, a finding of cause to remove an elected official from office will depend upon conduct that is sufficiently tied to the duties of the elected office from which an elected official is being removed.

{78}    Each of the Parties have referenced Professor Lawrence's article which discusses a series of hypotheticals designed to illuminate degrees of evidence which, based on historical uses, might be adequate to support removal from office. David M. Lawrence, *Removing Local Elected Officials from Office in North Carolina*, 16 Wake Forest L. Rev. 547, 555–60 (1980). Professor Lawrence suggests that grounds which support amotion may be grouped as disqualifying legal causes, such as failure to meet a residency requirement, misconduct in office, and neglect of duty. *Id.* at 554. He seeks to distinguish between "misconduct in office" and other evidence, which although is unsavory, does not impact official duties to a sufficient manner to warrant removal. As to the use of criminal offenses to prove misconduct in office, Dr. Lawrence observes a modern trend is to limit consideration to convictions of felonies and offenses that involve a violation of official duties. *Id.* at 556.

{79}    The court benefited from the article's scholarship and thorough research. But the evidence from case to case will seldom easily compress into convenient categories one may use to fashion hypotheticals. To the contrary, evidence will almost inevitably overlap categories. A court will properly examine

the cumulative evidence rather than parsing individual acts into separate pockets. Some evidence taken from personal life outside of office viewed in isolation may not appear appropriate to lead to removal, yet that same evidence may provide context for matters that are manifested by acts in office. No doubt, the evidentiary balance becomes even more fragile if findings must be based on criminal charges unaccompanied by convictions.

{80}    The court's considered analysis also suggests that the tie between the evidentiary record and the duties of office upon which the fact finder perceives should be more express than implied. That is, that the burden of showing sufficient competent evidence in most instances would impose on the fact finder an obligation to make clear how it has measured the underlying evidence as against the duties and abilities expected of the office. Again, the court recognizes that the standard is necessarily imprecise. While the court is not suggesting that this connection can always be objective, it should be as far removed from subjective as reasonably possible. References to perception as to loss of voter confidence are necessarily more subjective than events or expressions which actually document such erosion of confidence. And, again, the court, as apparently did the courts at common law, recognizes that some occurrences are so "infamous" that no further support is required.

{81}    The court also carefully considered the Board's references to Plaintiff's failure to abide by the Board's Code of Ethics, and the Parties' briefs address whether a violation of such a code is competent evidence supporting removal. The court reviewed the mandate of N.C.G.S. § 160A-86 which requires that the Board adopt such a code, and concludes that the phrasing of that statute amplifies that there should be a tie between the conduct complained of to support removal and the duties of the office from which the official is to be removed. The statute speaks in terms of the need to: "obey all applicable laws regarding official actions…;" "uphold integrity and independence of the board member's office;" "avoid impropriety in the exercise of the board member's official duties;" and "faithfully perform the duties of the office." N.C.G.S. § 160A-86 (b) (1)–(4).

{82} The court comments on Plaintiff's argument that a court should not consider a line of cases cited by the Board because they arise in the context of terminating employment of a public official as opposed from removing an elected official from office. While there may be distinctions, the employment cases are not altogether irrelevant. They recognize that a governmental body should not be paralyzed when faced with circumstances that create hostilities that thwart government functions or threaten those whose efforts are critical to performing those functions. An elected official is not necessarily immune from the government's power to respond simply because he was elected. Courts have clearly recognized that a governmental body may take appropriate action when problems arise regarding an elected official's conduct tied to the duties of office. *E.g., Walker v. United States Postal Serv.*, 4 F. App'x. 896 (D.C. Cir. 2001); *Giessow v. Litz*, 558 S.W.2d 742 (Mo. Ct. App. 1977).

{83} In addition to removal, a governmental body may in appropriate instances be within its powers to implement extraordinary restrictions on an elected official's access to government facilities, processes, computers, and e-mail systems. *E.g., Handy v. Lane Cnty.*, No. 6:12-cv-01548-AA, 2013 U.S. Dist. LEXIS 44177 (D. Or. Mar. 26, 2013). A North Carolina federal district court has recognized actions necessary to ameliorate adverse conduct may outweigh the elected official's right to free speech or expression of opinions. *See Iglesias v. Wolford*, 667 F. Supp. 2d 573 (E.D.N.C. 2009), *aff'd*, 400 F. App'x. 793 (4th Cir. 2010). Here, the evidence includes elements that admittedly may be more in the nature of inefficiencies and inconveniences, such as tardiness, but the Board also expressed great concern of actual or potential hostile work environment and genuine concerns for security and or personal safety. Plaintiff attacked the evidence to the extent it could be characterized as subjective fears of future events. The Board instead believed the evidence proved existing concerns. A court is always in a more secure position when it is able to divine between the two based on concrete evidence, and sometimes testimony may be more effective in distinguishing between the two than competing arguments as to what conclusions should be drawn from documents.

{84}  In summary, the matter must return to the Board for such further proceedings as it may elect to implement.  For that reason, the court has made no final determination as to the sufficiency of competent evidence to support the Board's conclusion that just cause exists to remove Plaintiff from office.  Should the matter return to this or another court upon a finding of just cause to remove Plaintiff from office resulting from further proceedings, a primary focus of the evidentiary review will be the sufficiency of competent evidence tied to the duties of the office from which the elected official is to be removed.

### E.  A Finding of Removal, Otherwise Proper, Would Not Be Precluded By Application of Article VI, Section 10 of the North Carolina Constitution

{85}  The Second Claim of the Amended Complaint asserts that even if the Board otherwise has power to remove Commissioner Berger, his removal cannot be effective until his successor is chosen and qualified.  He bases his claim on Article VI, Section 10 of the North Carolina Constitution which provides:

> In the absence of any contrary provision, all officers in this State, whether appointed or elected, shall hold their positions until other appointments are made, or, if the office is elective, until their successors are chosen and qualified.

{87}  While again this issue may not now be ripe with the court now remanding the matter, the court observes that there is a paucity of cases interpreting this provision.  The court construes the article as intending to allow for government business to be able to proceed between an election and the seating of the newly elected person, rather than to provide protection for the elected official whose term has expired.  As such, it should not and would not preclude the removal of an elected official in term, provided there was just cause for doing so determined upon proper procedure, and his removal need not await the appointment of the successor.  The court refused to issue an injunction against implementing the removal on the basis of this Article because it concluded that Plaintiff was unable to

show the probability of success on that claim. The court believes its decision to decline that requested injunction on that ground was a correct one.

## IV. CONCLUSIONS OF LAW

Based on the record reviewed, for the reasons stated, the court concludes as follows:

1.  The Parties are properly before the court and venue is proper;

2.  The Amended Complaint was an appropriate request for a writ of *certiorari* to review the determination of the Board;

3.  The court has the power and jurisdiction to review the Board's action pursuant to N.C.G.S. § 1-269, the record below has been furnished, and the matter is properly before the court;

4.  An amotion procedure remains a lawful procedure that may be utilized for the purpose of removing an elected official so long as such procedure includes notice and hearing and is based upon sufficient competent evidence demonstrating reasonable and just cause for removal;

5.  Competent evidence demonstrating reasonable and just cause for removal should relate to the duties of the elected office from which the elected official is to be removed;

6.  Any hearing must be before an impartial finder of fact based on evidence presented;

7.  Plaintiff has not presented a record demonstrating bias;

8.  However, the court cannot conclude that the Board's Order of Removal was made by an impartial fact finder based on evidence presented because that Order includes findings of fact based solely on the personal experiences of the fact finders, including interactions with unnamed staff;

9. The Board's Order of Removal must then be set aside without prejudice to the Board's ability to convene a further hearing and to take appropriate interim steps as necessary to provide for the conduct of the government's business or for safety and security;

10. Plaintiff is then restored to his elected office pending further proper action taken to remove him; and

11. In the event further proper action is taken to remove him, such removal need not be delayed solely to await the appointment and qualification of his successor.

IT SO ORDERED, this 5th day of September, 2013.